

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 24, 2017

**VIA ECF AND ELECTRONIC MAIL**

The Honorable Paul G. Gardephe
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States* v. *David Polos*,
             S1 15 Cr. 692 (PGG)

Dear Judge Gardephe,

      Sentencing in this matter is scheduled for January 31, 2017 at 2:30 p.m. The Government respectfully submits this letter in connection with that sentencing and in response to defendant Polos's memorandum of January 17, 2017.

      As the Court is aware from presiding over the trial in this case, the defendant made false statements to the United States government in order to preserve the delicate "double life" he and his co-defendant lived through at least December 2011. By day, and as the defense submission lays out in great detail, Polos was an Assistant Special Agent-in-Charge with the Drug Enforcement Administration ("DEA"), having years earlier been a decorated line agent in his own right. By night,[1] Polos and a DEA colleague, co-defendant Glen Glover, operated an adult entertainment establishment, despite having failed to get or even seek required DEA permissions to do so, and Polos struck up a romantic relationship with one of the establishment's dancers. These outside jobs and that relationship, as defendant Polos acknowledges, were fraught with peril from a national security standpoint, including opening the defendants up to potential blackmail. In order to maintain their double lives, the defendants lied and made material omissions to government agencies and investigators repeatedly: in their national security forms, in follow-up in-person interviews with investigators regarding their own applications for continued national security clearance, and even in Polos's character reference interview for Glover. The jury found, based upon the evidence at trial, that Polos and Glover conspired with

---

[1] The evidence at trial showed that Polos's management of the adult entertainment lounge was also a daytime matter, via in-person visits, phone, e-mail and text communication, and remote video surveillance.

each other to make these false statements based on a shared understanding, without which their efforts to cover-up their roles at the adult entertainment establishment would have been less likely to succeed.

For Polos's crimes, the United States Probation Office ("Probation Office"), in its Presentence Investigation Report ("PSR"), recommends a principal sentence of probation based, in part, on its calculation of a 0-6 month Guidelines range under the United States Sentencing Guidelines (the "Guidelines"). The Government agrees that the Guidelines calculation provided by the Probation Office is correct. In light of that Guidelines range, the Government respectfully requests that the Court impose a sentence that reflects the seriousness of the offenses the defendant committed. We devote the remainder of this letter to this issue.

## The Defendant and the Offense Conduct

Defendant Polos was an Assistant Special Agent-in-Charge at the DEA's New York Office, assigned to a Strike Force that waged some of the country's most important battles against international narcotraffickers. Polos's position was highly sensitive. The Strike Force's work resulted in the arrests of high level political officials in other countries and had been on the front line of the nation's ongoing activities in opposition to the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), a designated foreign terrorist organization. (Tr. 171). The Strike Force routinely handled classified national security information, including at the Top Secret level. (Tr. 172). Polos was responsible for three separate enforcement groups, including two for which he had both an active enforcement role as well as an administrative role – meaning that he had a leadership role in directing the actual on-the-ground enforcement operations as they happened. (Tr. 174). His groups were responsible for, among other things, the $101 million civil forfeiture related to the use of Lebanese Canadian Bank by the designated foreign terrorist organization Hezbollah, and the groundbreaking Silk Road investigation that led to the landmark prosecution of Ross Ulbricht in this District. (Tr. 176). Polos was also in charge of disseminating classified information received by the Strike Force to its agents. (T. 177). Were someone in Polos's position to be compromised, via blackmail or other means, the potential for harm to sensitive law enforcement interests was substantial.

In order to hold their positions at the DEA, Polos and his co-defendant were required to maintain security clearances at the Top Secret level. (Tr. 83). Maintaining those clearances, in turn, required undergoing periodic reinvestigations. (Tr. 84-85). As the first step of the reinvestigation, the defendants were required to electronically complete SF-86 forms, which are detailed background questionnaires. (Tr. 85-86.) Among other things, the defendants were required to list "all your employment activities" for the previous seven years and all individual foreign nationals with whom they had "close and/or continuing contact" and were bound by affection, influence, or obligation within that same timespan. (GX 101, 102 at 12, 23.) The applicants had to electronically certify the forms, and then execute and submit signature pages. (Tr. 638.) Both the certifications and the signature pages required the applicant to attest "My statements on this form, and on any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith." (GX 101 at 29; GX 102 at 33, 34, GX

103 at 3.) The forms contained a warning to the applicant that false statements are criminally punishable. (GX 101 at 29, GX 102 at 33.)

After an applicant completes the SF-86 form, the DEA personnel section transfers the application to the Office of Personnel Management, which has its own investigators or contractors conduct a background investigation including an interview of the subject and references. (Tr. 85, 88.) The application is then returned, together with the findings of the investigation, to the DEA for adjudication. (Tr. 89-90.)

In the summer of 2011, nearly a year after they first began running Twins Go-Go Lounge, an adult entertainment establishment in New Jersey, both Polos and his co-defendant underwent reinvestigations. Both made false statements in order to conceal their employment activities at the lounge. (GX 101 at 10-11; GX 102 at 12-14.) Polos's form also represented that he did not have relationships with foreign nationals to disclose. when in fact Polos had begun a romantic relationship with a Brazilian national who worked at the lounge as a dancer. (GX 102 at 23.)

In support of these false statements, the defendants made others. For his part, Polos omitted all mention of the Lounge when asked by a Government investigator what Glover did in his spare time during an August 18, 2011 character reference interview for Glover. (Tr. 1187). Polos also failed to disclose his activities at Twins Plus when asked detailed questions about outside employment in person during an interview regarding his own national security clearance on November 17, 2011. (Tr. 1026-28, 1044, 1052.).

The defendants, who each worked multiple weekly shifts at the lounge, oversaw the business's renovation, and monitored the club by day both remotely and in person, had ample motive for preserving these falsehoods. As an initial matter, the defendants were supposed to have obtained prior approval for outside employment. Such requests are rarely granted, and the defendants had made no such request, as would have quickly become apparent if the defendants had been truthful on their SF-86 forms. (Tr. 133, 181, 185, 447-449, GX 301.) Further, had the defendants disclosed their unauthorized outside employment (or Polos's affair with the dancer) on their SF-86s, the matter would have been referred to the Office of Professional Responsibility to investigate and then escalated to the head of Personnel Security for the entire DEA. (Tr. 126-27, 137-38.) The investigation would have posed a legitimate risk of the revocation of their security clearances, especially given the risks of illegal activity posed by the club. (Tr. 128-30, 139-40.)

As the evidence at trial showed, those risks of illegal activity became evident over the course of the defendants' management of the lounge. The lounge operated off the books for approximately its first year, resulting in the filing of inaccurate tax returns for tax year 2011. (Tr. 416-417, 427). Multiple employees of the lounge reported to Glover incidents of drug use at the club and evidence of sex in the stalls in which patrons would receive lap dances for money. (Tr. 285, 304-05, 879). The risk of the DEA learning of the defendants' involvement with the lounge merged with the risk of the DEA's learning of their proximity to these illegal activities.

## **The Seriousness of the Offense**

The Government does not take issue with Polos's recitation of the brighter moments of his career with the DEA.[2] As the Court undertakes the § 3553 analysis, however, it is important to bear in mind the seriousness of the offenses of conviction. As benign as knowingly submitting an inaccurate form may seem relative to violent and other serious offenses, it stands out in this case for several reasons.

First, the process that the form initiated – the national security background check reauthorization – is a vital endeavor that Polos's false statements compromised. The background check is the primary means the Government has to ensure that officials in Polos's position remain worthy of their access and responsibilities, and that national security information he has access to remains safeguarded. The task of making that determination is not left to the subject of the background investigation himself, for obvious reasons. By submitting forms with false information on them, Polos and his co-defendant effectively robbed the officials that make that determination of their ability to do so in an informed fashion. They prevented investigators from knowing about areas that would have been of greatest interest to them: possible susceptibility to blackmail, for example, and employment at a type of establishment that tends to attract other illegal activities such as drug use and prostitution.

It is unlikely that Polos would have been able to continue on in his role as an ASAC, or in his employment at the club, had these questions been answered truthfully. Even if the process might have yielded a different result, however, it was not Polos's process to undermine. His job – a job that involved oversight of sensitive law enforcement operations domestically and abroad, and the frequent handling and distribution of classified information – is too important for Polos to have decided unilaterally that the investigators and decision-makers did not deserve to have the truth. Polos and his co-defendant opened the DEA up to needless risk, having robbed deliberately undermined the process designed to police and limit such risk.

Second, the Court should consider that Polos's lie was not merely a single lie. The offenses of conviction were not executed solely in the seconds it took for Polos to check the wrong boxes or the minutes that it took to fill out the entire SF-86 form. Rather, Polos and his co-defendant engaged in a scheme that took months to play itself out, involving both men's

---

[2] The Government does not take a position, for sentencing purposes, as to whether that sample is truly representative of Polos's law enforcement career as a whole, but does not contest any of the specific, limited matters raised in those letters attached to the defense submission that speak to his last decade of service.

Nevertheless, the Government does note that, at trial, two different witnesses testified to bizarre episodes of firearms play at Twins Plus Lounge involving Polos. *See* Tr. 309 (Jeffrey Brown testifies that Polos's pulled out his gun and put it to the back of Brown's head, "playing around," while Brown was working on invoices), 993 (Ana Lindenfelser testifies that Polos showed him a gun strapped to his leg during a dispute over money and jokingly said, "Oh, I show you who owns the bar.").

security clearances and a joint, sustained cover-up that produced active lies and omissions at *eight* key points: (1) Glover's failure to mention his involvement in the lounge in his SF-86 form; (2) Glover's sending in his signature page the next day containing the false affirmation; (3) Glover's failure to mention his involvement in the lounge in his in-person interview; (4) Polos's omission of the lounge in his character reference interview for Glover; (5) Polos's failure to mention his work at the lounge in his form, (6) Polos's lie concerning his relationship with the dancer in the same form; (7) Polos's failure to mention the lounge in his in-person interview, and (8) Polos's failure to mention his relationship with the dancer in the same in-person interview. The scheme of which the jury found the defendants guilty required coordination and time. The prolonged, deliberate nature of the scheme makes it more serious than an isolated, off-the-cuff falsehood, and the Court should factor that into its sentencing calculus as well.

Third, the seriousness of the conduct at issue in this case, as outlined above, cries out for a measure of general deterrence, particularly in light of Polos's role as a senior official at the DEA. Thousands of federal employees undergo national security authorizations and reauthorizations every year, and as the trial demonstrated, the process requires employees to be fully honest in their responses. Without honest responses, both in writing and during the in-person interview, investigators are unable to assess potential security risks or decide what might require further investigation. Accordingly, when, as here, a senior government employee with access to highly sensitive information lies repeatedly throughout the process and conspires with a colleague to tell further lies, the Court's sentence must send the appropriate message that such conduct cannot be tolerated.

We therefore ask that the Court impose a sentence reflecting the seriousness of defendant Polos's conduct.

        Respectfully submitted,

        PREET BHARARA
        United States Attorney

by: _____
        Martin S. Bell
        Paul M. Monteleoni
        Andrew D. Goldstein
        Assistant United States Attorneys
        (212) 637-2467/2219/1559

cc: All Counsel (via e-mail and ECF)