UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____       │
│ DATE FILED: ___2/6/17___             │
└─────────────────────────────────────┘

UNITED STATES OF AMERICA,

-against-

DAVID POLOS and GLEN GLOVER,

Defendants.

**MEMORANDUM
OPINION & ORDER**

15 Cr. 692 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Following an eight-day trial, a jury convicted Defendants David Polos and Glen Glover of conspiring to make false statements on their national security forms, in violation of 18 U.S.C. § 371, and of making false statements on their national security forms, in violation of 18 U.S.C. § 1001.  (See June 9, 2016 Tr. (Dkt. No. 128) at 20-21)[1]  Polos and Glover have moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, or for a new trial under Federal Rule of Criminal Procedure 33.  (See Def. Br. (Dkt. Nos. 131-36))  Defendants argue that the weight of the evidence is insufficient to support the guilty verdict, and that newly discovered evidence regarding a key Government witness justifies granting a new trial.

## I.   THE EVIDENCE AT TRIAL

The Government's theory at trial was that Polos and Glover had agreed to conceal from their employer – the Drug Enforcement Administration (the "DEA") – their employment at Twins Plus Go-Go Lounge ("Twins" or "the Club"), an adult entertainment establishment in South Hackensack, New Jersey.  As part of the scheme, Polos and Glover did not disclose on

---

[1]  The page numbers in this Order refer to the designated page numbers in this District's Electronic Case Filing system.

their national security forms their employment at Twins, and Polos concealed his intimate
relationship with a Brazilian national who danced at the Club.

Glover was employed as a DEA Telecommunications Specialist from 1988 to
2015. (See May 31, 2016 Tr. (Dkt. No. 114) at 47)  Polos was employed by the DEA from 1991
to 2015, serving most recently as an Assistant Special Agent-in-Charge of the DEA's New York
office. (See id. at 131, 219)

The evidence at trial demonstrated that during 2011, Polos and Glover each
worked at Twins several times a week.  Jeffrey Brown, a bouncer at Twins, testified that (1) he
saw Polos and Glover every day at the Club (see June 1, 2016 Tr. (Dkt. No. 116) at 36-37); (2)
the Defendants held themselves out as owners of Twins (see id. at 41, 174); (3) Polos worked
Tuesday and Thursday evening shifts, while Glover worked Wednesday, Friday, and Saturday
evening shifts (see id. at 40); (4) the Defendants regularly stopped in at the Club during the day
(see id. at 53); and (5) when they were not working at the Club, the Defendants monitored the
security cameras at the Club from their cellphones.  (See id. at 64)  Brown testified that Polos
and Glover oversaw renovation work at the Club (see id. at 33), and that Glover hired bartenders
and bouncers.  (See id. at 55)

Joseph Banas – a regular customer at Twins who assisted Defendants in managing
the Club – testified that Polos worked one or two evening shifts per week and supervised the
bouncers (see June 3, 2016 Tr. (Dkt. No. 120) at 119, 145-46); that Glover managed Twins
several nights each week (see id. at 121); and that Polos and Glover presented themselves as the
"owners" of Twins.[2]  (See id. at 123)  Banas testified that Polos and Glover would do "[w]hat
any owner or manager would do, keep an eye on the place and make common sense decisions on

---

[2] Banas also testified that he occasionally covered evening shifts for Polos and Glover.  (See id.
at 116)

things." (Id. at 121)  Defendants hired and fired Twins employees, determined Club employee compensation, paid the Club's bills, promulgated rules and policies for the Club, and viewed the Club's security cameras from their cellphones.  (Id. at 133, 136-37, 141, 144, 179-80, 185) Glover hired Banas to perform electrical work at the Club, and Banas reported to Glover while he worked on this project.  (See id. at 97-100, 103-04)  Glover also supervised other renovations at Twins and oversaw a kitchen construction project.  (See id. at 103)  Polos was responsible for placing advertisements for the Club.  (See id. at 143)

Brown and Banas' testimony about Defendants' work at the Club was corroborated by dozens of text messages and emails introduced at trial, in which Polos and Glover discussed auditioning dancers; the hiring, firing, disciplining, and payment of Club employees; cleaning the lounge; obtaining licenses and permits; kitchen renovations; repairing Club equipment, including the fog machine, cooler, and television; painting the roof; scheduling shifts; setting house rules; hiring electricians; and paying the Club's bills.  (See, e.g., GX 403-R; GX 404-Z; GX 405-H; GX 405-L; GX 405-M; GX 405-R; GX 405-V; GX 405-OO; GX 405-XX; GX 405-AAA; GX 405-FFF; GX 405-MMM; GX 406-D; GX 406-G; GX 406-I; GX 406-L; GX 406-Z; GX 406-TT; GX 407-M; GX 407-S; GX 702; GX 1105-R; June 1, 2016 Tr. (Dkt. No. 116) at 243-55; June 2, 2016 Tr. (Dkt. No. 118) at 26-124, 142-206; June 3, 2016 Tr. (Dkt. No. 120) at 8, 15, 66-68, 97, 107-08, 115-16, 145, 156-59, 168-73, 177-86, 188-90)  The documentary evidence also included nightly reports sent to Polos and Glover, which summarized cash receipts at Twins and monies paid out.  (See GX 406-D; June 3, 2016 Tr. (Dkt. No. 120) at 145)

The evidence also demonstrated that Polos had a "romantic" relationship with Andressa de Lima – a Brazilian national who danced at the Club – from 2011 to 2015.  Brown

3

testified that de Lima was "Dave's girl" (see June 1, 2016 Tr. (Dkt. No. 116) at 65); that Polos received lap dances from de Lima at the Club (see id. at 67); and that Polos and de Lima were seen together outside of the Club "[a]ll the time." (Id. at 67-69, 107)  Banas testified that Polos treated de Lima differently than all of the other dancers, and excused her problematic behavior. (See June 3, 2016 Tr. (Dkt. No. 120) at 181-83)  De Lima confirmed that she had a "romantic" relationship with Polos between 2011 and 2015 (see id. at 78, 82-83), that they dated outside of the Club (see id. at 89), and that Polos did not tell her that he was married at the beginning of their relationship.  (See id. at 83)  Finally, in an August 2011 conversation with Banas, Polos expressed concern about rumors that de Lima was pregnant.  (See id. at 191-92)

As DEA employees, Polos and Glover were periodically required to complete a national security form (the "SF-86 form") to maintain their security clearances.  (See June 2, 2016 Tr. (Dkt. No. 118) at 139)  DEA employees seeking to renew their security clearances were required – when submitting their completed national security forms – to certify that all of the statements on the forms were "true, complete, and correct" to the best of their knowledge and belief; that they were "made in good faith;" and that they understood that "a knowing and willful false statement on the form can be punished by fine or imprisonment or both."  (GX 101 at 33; GX 102 at 33; May 31, 2016 Tr. (Dkt. No. 114) at 97-98)  DEA employees were also required to print, sign, and date the completed national security form before submitting it to DEA headquarters.  (See June 1, 2016 Tr. (Dkt. No. 116) at 165; June 2, 2016 Tr. (Dkt. No. 118) at 129)

The national security form seeks the following information concerning employment:

> List all your employment activities, beginning with the present (#1) and working back 7 years . . . You should list all full-time and part-time work, paid or unpaid,

consulting/contracting work, all military service duty locations, temporary military duty locations (TDY) over 90 days, self-employment, other paid work, and all periods of unemployment. **The entire period must be accounted for without breaks.** EXCEPTION: Do not list employments that occurred before your 18th birthday unless it is necessary for providing a minimum of 2 years of employment history.

(GX 101 at 10; GX 102 at 12 (emphasis in original); May 31, 2016 Tr. (Dkt. No. 114) at 131)

As to "Foreign Contacts," the national security form seeks the following

information:

Do you have or have you had close and/or continuing contact with foreign nationals within the last seven years with whom you, your spouse, or your cohabitant are bound by affection, influence, and/or obligation? Include associates as well as relatives not already listed in Section 18. (A foreign national is defined as any person who is not a citizen or a national of the U.S.)

(GX 101; GX 102; May 31, 2016 Tr. (Dkt. No. 114) at 100-01)

On August 1, 2011 and September 7, 2011, Glover and Polos, respectively,

submitted their completed national security forms. Both men indicated on the forms that they

had no outside employment. (See GX 101; GX 102; GX 204; May 31, 2016 Tr. (Dkt. No. 114)

at 131-33) Polos did not list any foreign national with whom he had close or continuing contact.

(See GX 102; May 31, 2016 Tr. (Dkt. No. 114) at 101)

The national security form requires applicants to list three references who know

the applicant "well" and who are "aware" of the applicant's activities outside of the workplace.

(See GX 101; GX 102) Glover listed Polos as a reference. (See GX 101; June 6, 2016 Tr. (Dkt.

No. 122) at 185-86, 204)

Because Glover had listed Polos as a reference, Jamila Whetts – a background

investigator for the DEA – interviewed Polos and questioned him about Glover's activities

outside the workplace. (See June 6, 2016 Tr. (Dkt. No. 122) at 205) Polos told Whetts that

Glover exercises and spends time with his wife. (See id. at 214)

5

Whetts also interviewed Glover on August 18, 2011, and asked him what he did in his free time. (See id. at 130) Glover said that he helped his wife run the Paramus Puppy Spa. (See id. at 140) Glover had not listed the puppy spa as outside employment on his national security form. Accordingly, Whetts asked Glover whether he had engaged in any other outside employment that was not listed on his national security form. (See id. at 149) Glover told Whetts that he had no other self-employment. (See id.)

April Boudreau – also a background investigator for the DEA – reviewed Polos' SF-86 form and interviewed Polos on November 17, 2011. (See id. at 32) Boudreau testified that Polos had not listed any outside employment on his national security form and did not disclose his work at the Club during the interview. (See id. at 58-59)

## II.   PROCEDURAL HISTORY

Count One of the Superseding Indictment charges Polos and Glover with conspiracy to make false statements on their national security forms, in violation of 18 U.S.C. § 371. (See S1 Indictment (Dkt. No. 30) ¶¶ 1-12) The Indictment alleges that, in furtherance of the conspiracy, (1) Polos and Glover "each submitted national security forms that falsely represented that they had had no employment outside of the DEA in the previous seven years;" (2) "each sat for background interviews concerning their own national security clearances during which neither of them disclosed their involvement in the Club;" and (3) "[a]s part of the scheme, [Glover] listed [Polos] as a reference familiar with Glover's 'activities outside of the workplace.' When Polos was interviewed during the background investigation concerning Glover, he was asked what Glover did during his spare time. Polos responded, in sum and substance, that Glover exercises and spends time with his family in his spare time; Polos did not make any mention of Glover's involvement in the Club." (Id. ¶¶ 7–9)

6

Counts Two and Three charge Glover and Polos, respectively, with "falsely affirm[ing] on a national security form that, as of that date, [they] had not had outside employment beyond [their] work with the DEA for the previous seven years, when in truth and in fact, and as [the Defendants] well knew, [they] had outside employment in the form of regular work at the Club." (Id. ¶¶ 14, 16)

Count Four charges Polos with "falsely affirm[ing] on a national security form that, as of that date, he had not had close or continuing contact with foreign nationals within the previous seven years, when in truth and in fact, and as Polos well knew, he had engaged in an intimate relationship with a foreign national for several months at the time of that affirmation." (Id. ¶ 18)

Trial began on May 31, 2016. The Government's evidence included testimony from Jeffrey Brown, a Club bouncer; Joseph Banas, a Club regular and occasional manager; Andressa de Lima, a Brazilian national who was a dancer at the Club, and with whom Polos was carrying on a romantic relationship; Jamila Whetts, a background investigator for the DEA who interviewed both Glover and Polos; and April Boudreau, another background investigator for the DEA who interviewed Polos. The Defendants did not testify. On June 9, 2016 – after three hours of deliberations – the jury returned guilty verdicts on all counts. (See June 9, 2016 Tr. (Dkt. No. 128) at 12, 20-21)

On July 15, 2016, Polos and Glover filed motions for a judgment of acquittal or, in the alternative, for a new trial.[3] (See Dkt. Nos. 131-36)

---

[3]  Polos and Glover moved for a judgment of acquittal at the close of the Government's case and renewed their motion at the close of all the evidence. (See June 7, 2016 Tr. (Dkt. No. 124) at 100; June 9, 2016 Tr. (Dkt. No. 128) at 22)  This Court reserved decision on both occasions. (See id.)

### III.   MOTIONS FOR A JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29

Defendants contend that the evidence is insufficient as to all four counts.  As to Count One, Defendants argue that the Government did not offer sufficient evidence that they conspired to make false statements.  (See Polos Br. (Dkt. No. 132) at 20; Glover Br. (Dkt. No. 136) at 27)  As to Counts Two and Three, Defendants argue that the employment-related question on the national security form is ambiguous (see Polos Br. (Dkt. No. 132) at 30; Glover Br. (Dkt. No. 136) at 17), and that their responses to this question are "literally true."  (See Glover Br. (Dkt. No. 136) at 22)  As to Count Four, Polos argues that the phrases "bound by affection, influence, and/or obligation" and "close and/or continuing contact" are ambiguous. (See Polos Br. (Dkt. No. 132) at 31-32)

The Government contends that the questions on the national security form are not ambiguous, that the "evidence overwhelmingly showed that the defendants' activities at the Twins Lounge constituted 'employment activities,'" and that the question about foreign contacts was "wholly intelligible," such that Polos' response constitutes a false statement.  (Govt. Br. (Dkt. No. 140) at 23, 32)

#### A.   Legal Standard

Federal Rule of Criminal Procedure 29(a) provides that a court shall, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  A defendant seeking to challenge a jury's guilty verdict "carries a heavy burden."  United States v. Oguns, 921 F.2d 442, 449 (2d Cir. 1990).  In evaluating a sufficiency challenge, this Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its

assessment of the weight of the evidence." United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008). "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'" United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (quoting United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995)). Moreover, in assessing a sufficiency challenge, "[t]he evidence is to be viewed 'not in isolation but in conjunction.'" United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) (quoting United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969)).

The critical question in evaluating a Rule 29 motion is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). In other words, Rule 29 "does not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (quoting Mariani, 725 F.2d at 865).

"[I]f [courts] are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, [however, they] must take seriously [their] obligation to assess the record to determine, as Jackson instructs, whether a jury could reasonably find guilt beyond a reasonable doubt." United States v. Clark, 740 F.3d 808, 811 (2d Cir. 2014) (emphasis in original). "[A] conviction based on speculation and surmise alone cannot stand." United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994). While a jury is "permitted to enter an unassailable but unreasonable verdict of 'not guilty,'" it does not have the "power to enter an unreasonable verdict of guilty." Jackson, 443 U.S. at 318 n.10 (quoting Carpenters & Joiners v. United States, 330 U.S. 395, 408 (1947)). "[S]pecious

inferences are not indulged," because '[it] would not satisfy the [Constitution] to have a jury determine that the defendant is <u>probably</u> guilty.'" <u>United States v. Lorenzo</u>, 534 F.3d 153, 159 (2d Cir. 2008) (internal quotations and citations omitted).

Finally, the Second Circuit has made clear that "if the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" <u>United States v. Glenn</u>, 312 F.3d 58, 70 (2d Cir. 2002) (quoting <u>United States v. Lopez</u>, 74 F.3d 575, 577 (5th Cir. 1996)). Accordingly, a district court must grant a defendant's Rule 29 motion where the evidence "viewed in the light most favorable to the Government, remains, at best, in equipoise." <u>Coplan</u>, 703 F.3d at 69.

### B.    <u>Analysis</u>

#### 1.    <u>Conspiracy to Make False Statements</u>

Defendants argue that the evidence is insufficient to prove that they conspired to make false statements about outside employment on their national security forms. (<u>See</u> Polos Br. (Dkt. No. 132) at 20; Glover Br. (Dkt. No. 136) at 27)

Testimony from Club employees and the Defendants' emails and text messages demonstrated that both men were deeply involved in managing the Club and supervising its employees, however. In 2011, each Defendant worked several evening shifts a week at the Club, monitored the security cameras at the Club from their cellphones daily, and received a nightly report concerning cash receipts. (<u>See</u> GX 406-D; GX 1105-R; June 1, 2016 Tr. (Dkt. No. 116) at 36-37, 40, 64; June 3, 2016 Tr. (Dkt. No. 120) at 119, 121, 133, 144-46) A reasonable jury could likewise have concluded that Polos and Glover were in close, regular communication about Club

affairs, given that they exchanged more than 400 calls and 900 text messages between July 19, 2011 and November 30, 2011 alone. (See June 7, 2016 Tr. (Dkt. No. 124) at 91-92)

There was also overwhelming evidence that Polos and Glover had compelling reasons to conceal their involvement with the Club from the DEA. Both men were aware of possible ongoing criminal activity at the Club, including illegal drug use (see GX 405-S; GX 405-FFF; June 3, 2016 Tr. (Dkt. No. 120) at 150), employment of undocumented aliens (see June 3, 2016 Tr. (Dkt. No. 120) at 26), tax evasion (see GX 551 at 1; June 1, 2016 Tr. (Dkt. No. 116) at 69-70; June 3, 2016 Tr. (Dkt. No. 120) at 143-45), and prostitution. (See GX 403-E; GX 403-O; June 1, 2016 Tr. (Dkt. No. 116) at 50) Given that both men were employed by a law enforcement agency, it would have been reasonable for the jury to infer that neither man wanted his involvement in the Club to come to the attention of the DEA.

It was in this context that Glover listed Polos as a reference on his national security form, and as someone who could verify what he did in his free time. (See GX 101; June 6, 2016 Tr. (Dkt. No. 122) at 185-86, 204) It would have been reasonable for the jury to infer that Glover listed Polos as his reference because he could be confident that Polos would not reveal Glover's involvement with the Club – given that Polos likewise had a strong motive to conceal his involvement with the Club. Moreover, when Whetts – the DEA's background investigator – questioned Polos about what Glover did in his spare time, Polos maintained Glover's secret, stating that Glover exercises and spends time with his family. (See id. at 214) Polos – who likewise was required to disclose any outside employment activities in order to maintain his position at the DEA – did not disclose that Glover managed employees and business operations at Twins at least three nights a week, and invested a significant part of his days

managing the Club through emails and text messages.  (See GX 406-D; June 1, 2016 Tr. (Dkt.

No. 116) at 52; June 3, 2016 Tr. (Dkt. No. 120) at 145; June 7, 2016 Tr. (Dkt. No. 124) at 91-92)

Viewed in the light most favorable to the Government, there was ample evidence

demonstrating that Polos and Glover had conspired together to not disclose their employment at

Twins on their national security forms.  The Defendants' motions for a judgment of acquittal on

the conspiracy count will be denied.

## 2.   Substantive Section 1001 Violations Concerning Outside Employment

### a.   Venue

Glover argues that the Government did not offer sufficient evidence that his false

statements about outside employment were made within the Southern District of New York.

(See Glover Br. (Dkt. No. 136) at 28)  Venue need only be proved by a preponderance of the

evidence.  See United States v. Ramirez, 420 F.3d 134, 139 (2d Cir. 2005).

Glover argues that the evidence shows that he transmitted his completed national

security form to DEA's Washington, D.C. headquarters at 11:34 p.m. on August 1, 2011.  (See

Glover Br. (Dkt. No. 136) at 28)  Noting that his transmission of the national security form took

place outside of normal working hours, and that he lived in New Jersey at the time, Glover

contends that the Government did not demonstrate that he made a false statement in the Southern

District of New York.  (See id.)

The Government introduced Glover's official time records at trial, however, and

these records indicate that Glover was on his "Scheduled Tour of Duty" when he emailed the

signature page for his national security form to DEA headquarters on August 2, 2011.  (See GX

103 at 1, 3; GX 323 at 2; June 2, 2016 Tr. (Dkt. No. 118) at 134-35)  Given this evidence, the

jury was entitled to find, by a preponderance of the evidence, that Glover emailed the signature

page for his national security form from his Manhattan office.  Accordingly, Glover's motion for

a judgment of acquittal on this ground will be denied.

### b.    Alleged Ambiguity in Question<br>Regarding Outside Employment

The national security form's outside employment question reads as follows:

> List all your employment activities, beginning with the present (#1) and working back 7 years. . . You should list all full-time and part-time work, paid or unpaid, consulting/contracting work, all military service duty locations, temporary military duty locations (TDY) over 90 days, self-employment, other paid work, and all periods of unemployment.  **The entire period must be accounted for without breaks.** EXCEPTION:  Do not list employments that occurred before your 18th birthday unless it is necessary for providing a minimum of 2 years of employment history.

(GX 101 at 10; GX 102 at 12 (emphasis in original); May 31, 2016 Tr. (Dkt. No. 114) at 131)

Polos and Glover argue that the outside employment question "do[es] not have 'a

meaning about which men of ordinary intellect could agree.'"  (Polos Br. (Dkt. No. 132) at 30

(quoting United States v. Lighte, 782 F.2d 367, 375 (2d Cir. 1986)); see Glover Br. (Dkt. No.

136) at 17)  According to Defendants, the instruction to list "all full-time and part-time work,

paid or unpaid," as well as all "self-employment," is ambiguous as to whether they were required

to list their work activities and ownership interest in Twins.  (See Polos Br. (Dkt. No. 132) at 29-

30)

"A question is fundamentally ambiguous when it is not a phrase with a meaning

about which men of ordinary intellect could agree, nor one which could be used with mutual

understanding by a questioner and answerer unless it were defined at the time it were sought and

offered as testimony."  Lighte, 782 F.2d at 375 (internal quotations omitted); see United States v.

Kerik, 615 F. Supp. 2d 256, 271 (S.D.N.Y. 2009).

In directing that "all" "self-employment" be disclosed, however, this question

unambiguously requires applicants to disclose their involvement in a business that they are

13

operating. Indeed, operating a business is perhaps the paradigm case of self-employment. The national security form's employment question also requires applicants to disclose "all" outside "work," whether "full-time [or] part-time work, paid or unpaid." (GX 101 at 10; GX 102 at 12) Given the myriad tasks that Polos and Glover performed at Twins – hiring and firing, overseeing construction, placing advertisements, managing the workforce, daily monitoring of cash receipts and expenditures, multiple shifts at the Club each week – it is obvious that disclosure of Defendants' "work" at the Club is required by the national security form.

Glover argues that this question is ambiguous in directing applicants to list "employment activities, going back seven years without a gap." (Glover Br. (Dkt. No. 136) at 20) (emphasis omitted) The national security form does not include the words "without a gap," however. The question states: "List all your employment activities, beginning with the present (#1) and working back 7 years. . . . **The entire period must be accounted for without breaks**." (GX 101 at 10; GX 102 at 12) (emphasis in original) By inserting "without a gap," Glover attempts to create ambiguity where there is none. There is no ambiguity as to the information the national security form seeks regarding outside employment.

### c.   **False Statements**

Defendants also contend that the Government did not demonstrate that they willfully and knowingly made materially false, fictitious, or fraudulent statements in their national security forms. (See Polos Br. (Dkt. No. 132) at 33; Glover Br. (Dkt. No. 136) at 22) Polos argues that he was simply a lender to Twins, and that his behavior was "entirely consistent with the behavior of someone treating Twins like an investment property and not as another source of employment." (Polos Br. (Dkt. No. 132) at 34) Glover similarly argues that his response to the outside employment question was "literally true," and that the Government did

14

not offer any evidence that Glover himself considered his work at Twins to be "employment." (Glover Br. (Dkt. No. 136) at 22)

The evidence at trial demonstrated, however, that Defendants' involvement with Twins went far beyond a passive investment.  As discussed above, Polos and Glover each supervised shifts at Twins two to three nights per week.  (See June 1, 2016 Tr. (Dkt. No. 116) at 52; June 3, 2016 Tr. (Dkt. No. 120) at 119)  Defendants hired and fired Twins employees, determined the compensation Club employees would receive, paid the Club's bills, promulgated Club rules and policies, and viewed the Club's security cameras from their cellphones.  (See June 3, 2016 Tr. (Dkt. No. 120) at 133, 136-37, 141, 144, 179-80, 185)  Glover managed Twins' online presence (see GX 407-J; GX 410-B; GX 410-G), while Polos placed advertisements for the Club.  (See GX 408-F; June 3, 2016 Tr. (Dkt. No. 120) at 143)  Indeed, Defendants were directly involved in the day-to-day management of every aspect of the Club, including the auditioning and hiring of dancers; overseeing kitchen renovations; paying Club employees; arranging for the repair of Club equipment; and scheduling shifts for Club employees.  (See June 1, 2016 Tr. (Dkt. No. 116) at 243-55; June 2, 2016 Tr. (Dkt. No. 118) at 26-124, 142-206; June 3, 2016 Tr. (Dkt. No. 120) at 8, 15, 66-68, 97, 107-08, 115-16, 145, 156-59, 168-73, 177-86, 188-90)  Polos emphasized to Glover that daily communication regarding the Club was essential: "We, me including[,] need to communicate with each other on a daily basis[.]  [T]he small things are slipping through the cracks."  (GX 407-S)

In sum, Polos and Glover were actively engaged in the daily management of the Club.  Each man worked multiple shifts at the Club every week, and when not on-site, each Defendant monitored activity at the Club using apps on their cellphones that linked up with security cameras inside the Club.  Given the Defendants' duties and responsibilities at the Club,

a reasonable jury could conclude that they themselves considered their work at Twins

"employment activities" within the meaning of the national security form, and intentionally

failed to disclose their employment at the Club on their national security forms. Defendants'

motion for a judgment of acquittal on Counts Two and Three will be denied.[4]

### 3.    Substantive Section 1001 Violation
### Concerning Contact with Foreign Nationals

The national security form question concerning contact with foreign nationals

reads as follows:

> Do you have or have you had close and/or continuing contact with foreign nationals
> within the last seven years with whom you, your spouse, or your cohabitant are bound by
> affection, influence, and/or obligation?  Include associates as well as relatives not already
> listed in Section 18. (A foreign national is defined as any person who is not a citizen or a
> national of the U.S.)

(GX 102; May 31, 2016 Tr. (Dkt. No. 114) at 100-01)

The Government argues that the evidence demonstrates that, at the time Polos

filled out his national security form, he was engaged in a romantic relationship with Andressa de

Lima, a dancer at the Club who is a Brazilian national.  According to the Government, Polos'

relationship with de Lima constitutes "close and/or continuing contact with [a] foreign

---

[4]  Glover notes that he did not list the Paramus Puppy Spa under "Employment Activities" on the
national security form, yet "[t]he Indictment did not charge him with a false statement for that
omission." (Glover Br. (Dkt. No. 136) at 21)  The facts concerning Glover's disclosure of his
involvement with the puppy spa, however, merely confirm that his non-disclosure of his work at
the Club was willful and intentional.

As noted above, Background Investigator Jamila Whetts learned about Glover's work at the
puppy spa during her interview of Glover at his Manhattan office on August 18, 2011.  Glover
had not disclosed his work at the puppy spa on his national security form.  After eliciting the
facts concerning Glover's work at the puppy spa, Whetts asked Glover, "Are there any other
self-employments not listed on the form[?]" (June 6, 2016 Tr. (Dkt. No. 122) at 149)  Glover
said "no." (See id.)  Indeed, Glover did not disclose his work at Twins at any point in the
interview. (See id. at 149-50)  Given Whetts' specific inquiry about "other self-employments"
after their discussion about the puppy spa, Glover's failure to disclose his work at Twins can
only have been intentional.

national[]" to whom Polos was "bound by affection, influence and/or obligation." (See Govt. Br. (Dkt. No. 140) at 30-31)

Polos asserts that the national security form is ambiguous because the definition of "foreign nationals" is found under the heading "Foreign Contacts." (See Polos Br. (Dkt. No. 132) at 32) The Court is satisfied, however, that it is clear, in context, that "Foreign Contacts" refers to "close and/or continuing contact with foreign nationals." It is likewise crystal clear that a "foreign national" is a "person who is not a citizen or a national of the U.S." (GX 102; May 31, 2016 Tr. (Dkt. No. 114) at 100-01)

Polos also contends that the phrases "close and/or continuing contact," and "bound by affection, influence, and/or obligation," are "fundamentally ambiguous." (See Polos Br. (Dkt. No. 132) at 31-32; id. at 31 ("Affection, influence, and obligation can take many forms to many different people.")) According to Polos, "close or continuing contact" could mean physical intimacy or emotional intimacy, and the phrase is therefore "fundamentally ambiguous." (See id. at 32)

This Court finds no ambiguity in the "contact with foreign nationals" question. The question seeks disclosure of any "close and/or continuing contact with [a] foreign national[ with whom the applicant is] bound by affection, influence, and/or obligation." (GX 102; May 31, 2016 Tr. (Dkt. No. 114) at 100-01) The question thus requires an emotional connection or bond of some sort; physical contact alone is not sufficient.

Here, there was ample evidence that Polos and de Lima had a strong emotional relationship and that this relationship existed as of September 7, 2011, when Polos executed his national security form. De Lima testified that her relationship with Polos was "romantic" (see June 3, 2016 Tr. (Dkt. No. 120) at 78), and that she and Polos dated from 2011 to 2015 outside

the Club. (See id. at 78, 82-83, 89)  De Lima began dancing at the Club at the end of April or

early May of 2011 (see id. at 81), and her romantic relationship with Polos began a few months

later. (See id. at 82)  Moreover, Polos and de Lima spoke nearly every day in the months

surrounding Polos' September 7, 2011 execution of the national security form.  Indeed, the

evidence demonstrated that Polos and de Lima spoke by telephone on 176 occasions between

May 2011 and November 17, 2011 alone. (See June 7, 2017 Tr. (Dkt. No. 124) at 91)

       Banas – who functioned as a manager at the Club – also testified to Polos'

"interest" in de Lima. (See June 3, 2016 Tr. (Dkt. No. 120) at 193)  Polos' preference for de

Lima was so obvious that Banas did not include Polos on emails he sent to the other owners of

the Club about de Lima's misbehavior.  "[Polos] always allowed her – you know, enabled her to

behave that way, made excuses for her." (Id. at 183)  Polos also favored de Lima over all the

other dancers from the outset of her dancing at the Club.[5]  Brown – the Twins bouncer – testified

that Polos chose de Lima for his partner for most of the lap dances he received. (See June 1,

2016 Tr. (Dkt. No. 116) at 67)  Moreover, in an August 2011 conversation with Banas, Polos

expressed concern about pregnancy rumors concerning de Lima. (See June 3, 2016 Tr. (Dkt. No.

120) at 191-92)

       Viewing the evidence in the light most favorable to the Government, a reasonable

jury could have found that Polos – at the time he completed his national security form – had a

close and continuing relationship with de Lima – a citizen of Brazil – with whom he was bound

by affection.  Polos' motion for a judgment of acquittal on Count Four will be denied.

---

[5]  Polos' text messages to Banas also contain personal references to de Lima. See, e.g., GX
1105-R at 80 (Polos to Banas on August 18, 2011:  "Tell the bartenders stop serving Andressa.");
GX 1105-R at 141 (Polos to Banas on November 6, 2011:  "In regard to Andressa, she had her
period this afternoon.").

## IV.   MOTIONS FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33

Defendants argue that they are entitled to a new trial under Federal Rule of Criminal Procedure 33 because (1) allowing the verdict to stand would be a manifest injustice, and (2) they have newly discovered evidence concerning Jeffrey Brown, a Government witness. (See Glover Br. (Dkt. No. 136) at 32, 38; Poios Br. (Dkt. No. 134) at 11)

### A.   Manifest Injustice

Under Fed. R. Crim. P. 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, see United States v. Leslie, 103 F.3d 1093, 1100-01 (2d Cir. 1997), but also where a jury's verdict is contrary to the weight of the evidence. See United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001).

The Second Circuit has explained that

> [t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

Id. (internal citations and quotation marks omitted).

In considering a Rule 33 motion, "[t]he district court must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." Id. at 133 (quoting United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000)).

Unlike under Rule 29, a district court need not view the evidence in the light most favorable to the Government. See United States v. Ferguson, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999), aff'd, 246 F.3d 129 (2d Cir. 2001).

Here, overturning the jury's verdict is not necessary to prevent a manifest injustice. As discussed above, there was ample evidence of the Defendants' guilt on each count of the Superseding Indictment. As suggested by the brevity of the jury's deliberations, this was not a close case, and there can be no real concern that an innocent person may have been convicted.

**B.**     **Newly Discovered Evidence Concerning Jeffrey Brown**

Although the Government provided Jeffrey Brown's rap sheet to Defendants more than a week before trial, Defendants now argue that they are entitled to a new trial under Fed. R. Crim. P. 33 because of newly discovered evidence concerning Brown's 25-year-old conviction for attempted robbery.

**1.**     **Legal Standard**

As discussed above, new trial motions under Rule 33 "'are granted only with great caution . . . [and] in the most extraordinary circumstances.'" Sanders v. Sullivan, 863 F.2d 218, 225 (2d Cir. 1988) (quoting United States v. DiPaolo, 835 F.2d 46, 49 (2d Cir. 1987)). "To merit relief based on a claim of newly discovered evidence, the burden is on the defendant to satisfy five elements: (1) that the evidence is newly discovered after trial; (2) that facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) that the evidence is material; (4) that the evidence is not merely cumulative or impeaching; and (5) that the evidence would likely result in an acquittal [upon retrial]." United States v. James, 712 F.3d 79, 107 (2d Cir. 2013) (internal citations and quotations omitted).

"[A] new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." Id. (quoting United States v. Parkes, 497 F.3d 220, 233 (2d Cir. 2007)). "In general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime'" or "where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." United States v. Payne, 63 F.3d 1200 (2d Cir. 1995) (quoting United States v. Petrillo, 821 F.2d 85, 90 (2d Cir. 1987)).

### 2.   The Court's Ruling at Trial Concerning Brown's 1991 Attempted Robbery Conviction

The Government turned over Jeffrey Brown's Jencks Act material to Defendants on May 23, 2016, eight days before he testified. (See June 3, 2016 Tr. (Dkt. No. 120) at 243-44; Govt. Br. (Dkt. No. 140) at 34) The rap sheet provided by the Government showed that Brown had a September 15, 1990 arrest for robbery – which was resolved with a February 29, 1991 plea to attempted robbery in the first degree – and a September 14, 1990 arrest for robbery and criminal possession of stolen property, which was resolved with a February 20, 1991 plea to attempted robbery in the second degree. Both arrests were made in New York County, and both guilty pleas were entered in New York County Supreme Court. (See 3505-5 at 23-24, 42-43; Govt. Br. (Dkt. No. 140), Ex. A at 2-5)

In a June 1, 2016 letter, the Government asked the Court to preclude cross-examination concerning Brown's "1991 conviction . . . for attempted robbery in New York Supreme Court, New York County." (See Govt. Ltr. (Dkt. No. 105) at 1; June 1, 2016 Tr. (Dkt. No. 116) at 3) It is not clear from the Government's letter which of Brown's 1991 attempted robbery convictions the Government is referencing. Shortly before Brown's testimony on June

21

1, 2016, the Court asked the Government whether "it had any more information about that crime?" (June 1, 2016 Tr. (Dkt. No. 116) at 3) The Government then conducted a "30-second" debriefing of Brown concerning the circumstances of a 1991 attempted robbery conviction. (See June 3, 2016 Tr. (Dkt. No. 120) at 246) After a "very brief" conversation with Brown, the Government then stated the following to the Court:

> The incident apparently took place in a bar. Mr. Brown and another patron got in a fight. Mr. Brown and the other person engaged in fisticuffs, I think bottles were used by both combatants. Mr. Brown eventually won that fight and, at the conclusion of that fight, took the other participant's money from his pocket at which point an undercover police officer emerged from the crowd. Those are the circumstances of the incident that led to that 1991 conviction.

(June 1, 2016 Tr. (Dkt. No. 116) at 23) Polos' counsel argued that he should be permitted to cross-examine Brown concerning this incident and the related 1991 attempted robbery conviction. (Id. at 24-26)

The Court commented that given the age and nature of the attempted robbery conviction, it did not appear to be probative of Brown's credibility:

> [The] problem here is that the event happened – the incident, the bar fight which led to the theft of the monies, as I understand it, is 25 years ago. [Rule] 609(b) of the Federal Rules of Evidence provides, as a general matter, that if a conviction is more than 10 years old it is not admissible as a general matter, subject to the Court's determination that there is something about the facts of the conviction that make it probative.
>
> Now, what the government has represented is this was a bar fight in which the witness engaged after he prevailed over his adversary, he stole the victim's money. Those aren't the types of facts that go to truth telling or propensity to tell the truth and so that's a problem, but a greater problem is the age of the incident.

(Id. at 23)

After hearing additional argument from counsel, this Court issued its ruling:

> As I indicated at the outset, this issue is governed by Rule 609(b) of the Federal Rules of Evidence. That rule provides, and I quote, "this subdivision B applies if more than 10 years have passed since the witness' conviction or release from confinement for it, whichever is later. Evidence of a conviction is admissible only if (1), its probative value,

22

supported by specific facts and circumstances substantially outweighs its prejudicial effect; and (2), the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use."

So, this was a 1991 incident. I have been informed that Mr. Brown served a sentence somewhere in the neighborhood of six and a half years so that would mean that under the rule the applicable year would be 1997 or 1998 and, in either event, far outside the 10 year period set forth in 609(b). So, that requires me to consider whether the probative value of the conviction substantially outweighs its prejudicial effect. I conclude that the standard has not been met here.

First of all, the underlying circumstances – a bar fight involving the use of fists and bottles – the witness apparently won the fight, stole the victim's money, and I might say received a very significant sentence for his crime. Understanding that some courts have found robberies to be crimes that bear on truth telling, this falls at the end of the spectrum and not probative of truth telling. It is a violent encounter that took place [at] the end of which money was stolen but it's not the sort of planned event that the courts make reference to and it falls closer to a crime of violence than it does to one involving the propensity to testify truthfully. But the most critical aspect of it is it is just too old an incident that happened 25 years ago and in my judgment sheds little light on the witness' ability to tell the truth today.

I will also say that I suspect that someone who has the occupation of being a bouncer at an adult entertainment establishment, the jury is probably not going to approach them as pure as the driven snow, to quote [counsel for Polos].

So, for those reasons, I am excluding the attempted robbery conviction from 1991.

(Id. at 28-29)

Two days later – near the close of the Government's case – Cathy Ann Fleming, Glover's lawyer, stated that Brown's 1991 attempted robbery conviction did not arise from a bar fight, and she asked the Court to direct the Government to produce additional information concerning Brown's robbery arrests and convictions from the 1990-91 time period:

I would like to enlist the Court's help on one issue. We have been looking into the circumstances of the Jeff[re]y Brown conviction. It struck us as being bizarre that he had such a lengthy sentence for a bar fight with a stolen wallet and we're trying very hard to get the underlying details. It's in Manhattan. When we got the records, the FBI number and date of birth had been blacked out so it was not easy before trial. We've been trying really hard to get it. And I have a good faith basis to believe it was not a bar fight and it was not stealing a wallet.

> We're having a hard time getting the records, but I believe based on what I've been told
> so far that it's a series of robberies, including some weaponry. . . . But I would like to ask
> that – the U.S. Attorney's Office and the FBI have much more access to law enforcement
> records than we do and I think that it's worth looking into.

(June 3, 2016 Tr. (Dkt. No. 120) at 241)

After Glover's counsel noted that "the rap sheet shows multiple robberies arrests

around the same time," the Court responded, "[s]o this was all available to you before the trial

presumably." (Id. at 243)  Glover's counsel answered, "Well, yes and no, your Honor. . . . I had

the rap sheet without a date of birth, with an FBI number, without identifying number." (Id. at

243-44)  This Court pointed out, however, that "to the extent that you intended to argue that

actually there were multiple robberies associated with his 1991 conviction . . . that argument

could have been made to me before the trial even started." (Id. at 244)  Glover's counsel replied,

"That's correct." (Id.)

The Court then asked Glover's counsel to clarify the nature of her application:

The Court:      Well, what exactly are you asking them to find out?

Ms. Fleming:   All I'm asking [is] if they can find the records.

The Court:      Find out what records?  What records are you asking them to find?

Ms. Fleming:   The police records that relate to what these arrests are and to find out what
               really happened here, if what he was really convicted of was a bar fight
               where he stole someone's wallet as he represented to the Court through the
               U.S. Attorney's Office.

(Id. at 244-45)

The Court then reiterated that, given the age of Brown's attempted robbery

conviction, it was not admissible under Rule 609(b):

> Well, the fundamental problem . . . is it's 25 years old.  That's the fundamental problem.
> It goes back to 1991.  And I read you the [F]ederal [R]ule of [E]vidence that applies to
> this which is fairly straightforward which is that if a conviction is more than ten years
> old, generally speaking, it's not admissible absent special circumstances.

24

(Id. at 245)  Nonetheless, at Fleming's request – four days into the trial and late on a Friday afternoon – this Court directed the Government to attempt to obtain additional information from the Manhattan District Attorney's Office concerning Brown's "1991 robbery conviction":

> The Court:  . . . . You're directed to make an inquiry of the Manhattan DA's office, to the extent you can reach somebody there this evening, about whether they have any paperwork relating to Mr. Brown's 1991 robbery conviction, to include police reports or any other paperwork.  I'm directing you to do that.

(Id. at 247)[6]

When trial resumed on Monday morning, June 6, 2016, the Court inquired of defense counsel what issues they wanted to raise before the jury was brought out. (See June 6, 2016 Tr. (Dkt. No. 122) at 5-7)  Defense counsel made applications concerning two upcoming witnesses – April Boudreau and Jamila Whetts – but made no further application concerning Brown or his 1991 attempted robbery conviction. (Id.)  The matter was never raised again at trial.

On June 17, 2016 – more than a week after the jury had returned its verdict – the Government produced to Defendants the "contents of the file received from the New York County District Attorney's Office on June 15, 2016." (Glover Br. (Dkt. No. 134) at 10)  The documents produced by the Government included an indictment of Brown for first degree robbery and grand larceny, and a criminal complaint charging Brown with robbery in the first degree, in connection with Brown's forcible taking of four leather coats from a store on August 30, 1990. (See Calme Aff. (Dkt. No. 137-1) at 3-5)  Related paperwork from the District

_____

[6]  The Government represents that it complied with the Court's directive. (See Govt. Br. (Dkt. No. 140) at 37)

Attorney's Office indicates that Brown was arrested for this crime on September 15, 1990,

"when he was caught on <u>another</u> rob[bery] case." (<u>Id.</u> at 7, 14) (emphasis in original)

### 3. <u>Analysis</u>

#### a. <u>Due Diligence</u>

As an initial matter, the record does not demonstrate "due diligence on the part of

the movant[s] to obtain the [alleged newly discovered] evidence." <u>James</u>, 712 F.3d at 107.

Defendants had a rap sheet reflecting all of Brown's quarter-century-old robbery arrests and

convictions more than a week before trial and nine days before Brown testified.  Had defense

counsel inquired before trial as to the details of Brown's three 1990 robbery arrests and two 1991

robbery convictions, they could have obtained this information before Brown testified.

Defendants provide no explanation as to why they made no application concerning Brown's

criminal record until the midst of trial.  Defendants likewise do not explain why – having raised

the issue at trial and obtained a ruling from the Court directing the U.S. Attorney's Office to

obtain additional information concerning Brown's 1991 attempted robbery conviction from the

Manhattan District Attorney's Office – they did not renew their application.  If Defendants were

dissatisfied when they returned to court on Monday, June 6, 2016, as to the information obtained

by the U.S. Attorney's Office concerning Brown's 1991 attempted robbery conviction, they were

obligated to raise the issue with the Court.  Instead, the matter was never raised again at trial.

Accordingly, Defendants have not demonstrated "due diligence."

#### b. The New Evidence is Not Material and<br>Would Not Have Led to an Acquittal

As an initial matter, the additional evidence concerning Brown's 1991 attempted

robbery conviction is not material, because the Court would not have admitted it at trial.  <u>See</u>,

<u>e.g.</u>, <u>United States v. Salameh</u>, 54 F. Supp. 2d 236, 282 (S.D.N.Y. 1999), <u>aff'd</u>, 16 Fed. App'x 73

(2d Cir. 2001) (noting that because alleged newly discovered evidence would have been inadmissible, defendant's new trial motion could be denied on that basis alone) (citing United States v. Stromberg, 179 F. Supp. 278, 279-80 (S.D.N.Y. 1959) (denying new trial motion based on newly discovered evidence because this evidence was not admissible, and thus, could not possibly produce a different result at a new trial). As the Court explained multiple times during the trial, evidence of a conviction and underlying violent conduct from 25 years ago is simply not probative of Brown's credibility. (See June 1, 2016 Tr. (Dkt. No. 116) at 23, 28-29; June 3, 2016 Tr. (Dkt. No. 120) at 245)

Moreover, to the extent that Defendants contend that the new evidence proves that Brown lied to the AUSA – during the "30-second" debriefing just before Brown testified (see June 1, 2016 Tr. (Dkt. No. 116) at 23; June 3, 2016 Tr. (Dkt. No. 120) at 246) – in stating that his 1991 attempted robbery conviction arose from a "bar fight" (see Polos Br. (Dkt. No. 134) at 12; Glover Br. (Dkt. No. 136) at 32), that is by no means clear. Brown's rap sheet indicates that he sustained three robbery arrests in 1990, two of which led to convictions for attempted robbery in 1991. (See 3505-5 at 23-24, 42-43) Brown's description of the bar fight to the AUSA – in which, after prevailing over his adversary, he stole money from the man's pockets and was then arrested by police (see June 1, 2016 Tr. (Dkt. No. 116) at 23), makes out the elements of attempted robbery, see N.Y. Penal Law § 160, and is consistent with notes in the Manhattan District Attorney's Office paperwork indicating that Brown was arrested in the stolen coats case "when he was caught on another rob[bery] case." (Calme Aff. (Dkt. No. 137-1) (DA Data Sheet) at 14) In short, Brown had two 1991 attempted robbery convictions, and although one related to the theft of coats, nothing in the record demonstrates that the other attempted robbery conviction did not involve a bar fight in which Brown stole his adversary's money.

In any event, and as discussed above, "[i]n general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime'" or "where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." Payne, 63 F.3d at 1210. Although Defendants strive mightily to argue that the Government's case depended on Brown (see Polos Br. (Dkt. No. 134) at 14-15; Glover Br. (Dkt. No. 136) at 34, 36), as this Court's earlier discussion of the evidence at trial indicates, that is not true.

While Brown testified that Polos and Glover worked shifts at the Club; held themselves out as the owners; oversaw renovations at the Club; and hired bartenders and bouncers (see June 1, 2016 Tr. (Dkt. No. 116) at 33, 40-41, 55, 174), Joseph Banas – a regular customer at Twins who assisted Defendants in managing the Club – confirmed all of these points and more. Banas testified that Polos worked one or two evening shifts per week and supervised the bouncers (see June 3, 2016 Tr. (Dkt. No. 120) at 119, 145-46); that Glover managed Twins several nights each week (see id. at 121); and that Polos and Glover presented themselves as the "owners" of Twins. (See id. at 123) Banas also testified that Polos and Glover hired and fired Twins employees, determined Club employee compensation, paid the Club's bills, and promulgated rules and policies for the Club. (Id. at 133, 136-37, 141, 144, 179-80, 185) Banas further testified that Glover had hired him to perform electrical work at the Club, and that Glover supervised other renovations, including a kitchen construction project. (Id. at 97-100, 103-04) Banas also testified that Polos was responsible for placing advertisements for the Club. (See id. at 143) In short, Banas' testimony was devastating. Moreover, unlike Brown – who was impeached based on his antipathy to Polos, the fact that Polos had put a gun to his head; and the

fact that Glover had fired him (see June 1, 2016 Tr. (Dkt. No. 116) at 102-03, 109-11), Banas had no apparent motive to fabricate.

As discussed above, Brown and Banas' testimony about Defendants' work at the Club was also corroborated by numerous text messages and emails in which Polos and Glover discussed auditioning dancers; the hiring, firing, disciplining, and payment of Club employees; cleaning the lounge; obtaining licenses and permits; kitchen renovations; repairing Club equipment; painting the roof; scheduling shifts; setting house rules; hiring electricians; and paying the Club's bills. (See, e.g., GX 403-R; GX 404-Z; GX 405-H; GX 405-L; GX 405-M; GX 405-R; GX 405-V; GX 405-OO; GX 405-XX; GX 405-AAA; GX 405-FFF; GX 405-MMM; GX 406-D; GX 406-G; GX 406-I; GX 406-L; GX 406-Z; GX 406-TT; GX 407-M; GX 407-S; GX 702; GX 1105-R; June 1, 2016 Tr. (Dkt. No. 116) at 243-55; June 2, 2016 Tr. (Dkt. No. 118) at 26-124, 142-206; June 3, 2016 Tr. (Dkt. No. 120) at 8, 15, 66-68, 97, 107-08, 115-16, 145, 156-59, 168-73, 177-86, 188-90)

Brown's testimony concerning Polos' relationship with de Lima was corroborated both by Banas and by de Lima herself. (See June 3, 2016 Tr. (Dkt. No. 120) 77-78, 82-83, 89, 181-83, 191-93)

In sum – setting Jeffrey Brown's testimony aside – the record still contains ample evidence that Polos and Glover falsely represented that they had no outside employment, and that Polos falsely represented that he had no close and/or continuing contact with a foreign national. The Defendants' motions for a new trial will be denied. [7]

---

[7]  Glover also argues that his defense was undermined by the Office of Personnel Management's ("OPM") failure to respond more quickly to his Rule 17(c) subpoenas concerning a False Claims Act settlement entered into by United States Investigations Services ("USIS"), which conducted background investigations for the DEA. (See Glover Br. (Dkt. No. 136) at 40)  Glover claims that OPM's delay deprived him of the opportunity to argue at trial that certain documents and

## CONCLUSION

For the reasons stated above, Defendants' motions for a judgment of acquittal or

for a new trial, are denied.  The Clerk of the Court is directed to terminate the motions (Dkt. Nos.

131, 133, 135).

Dated: New York, New York
      February 6, 2017           SO ORDERED.

                                      *Paul G. Gardephe*
                                      Paul G. Gardephe
                                      United States District Judge

---

reports were purportedly "not reviewed properly at the [USIS]." (Id.)  However, this Court repeatedly directed Glover's lawyer to brief this issue if she wished to pursue this line of inquiry. (See May 20, 2016 Tr. (Dkt. No. 107) at 44; May 31, 2016 Tr. (Dkt. No. 114) at 13)  Counsel did not brief this issue, and ultimately told the Court – before trial began – that she would conduct her cross-examinations "without going into that issue, and then [would] supplement it if [she] need[ed] an OPM witness." (May 31, 2016 Tr. (Dkt. No. 114) at 13)

During the first day of trial, however, Glover argued that the Government had opened the door to her introducing the USIS settlement, because DEA Special Agent Barbara Roach testified as to OPM's practice of "thoroughly vet[ting]" national security forms.  (Id. at 101, 116-17)  This Court ruled that, as a result of Agent Roach's testimony, "defense counsel is going to be permitted to explore what OPM does. . . ."  This Court noted, however, that Agent Roach's testimony "isn't about the USIS debacle." (Id. at 117)  Glover's lawyer responded, "I understand." (Id.)  This Court then reiterated that Glover would be permitted "some leeway to cross-examine [Agent Roach] on exactly what OPM does." (Id.)  Glover's lawyer then went on to cross-examine Agent Roach concerning OPM's practices.  (See id. at 158-60)  Glover never briefed the relevance or admissibility of evidence concerning the USIS settlement, however, and did not raise the USIS settlement issue again.  Given these circumstances, the issue has been waived.

In any event, there is no evidence that the allegedly inadequate investigations USIS conducted in other cases had any bearing on the false statements that Defendants made in their national security forms.  (See May 20, 2016 Tr. (Dkt. No. 107) at 42-43)  The jury found that Glover and Polos had falsely stated in their national security forms that they had no outside employment, and that Polos had falsely stated that he had no close or continuing contact with a foreign national, and USIS's inadequate review of national security forms in other cases provides no basis to question the jury's determination.  Moreover, OPM represented that Polos and Glover's national security forms were not among those affected by the allegedly inadequate investigations that led to the False Claims Act settlement.  (See id. at 42)  In sum, USIS's False Claims Act settlement is wholly irrelevant to the issues in this case and provides no basis for a new trial.